[No. 18911.   Department Two.   May 6, 1925.]

# N. & M. LUMBER COMPANY, *Respondent*, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, *Appellant*.[1]

RAILROADS (13)—CONSTRUCTION OF SPUR TRACK—MAINTENANCE AND COST—CONTRACT—CONSTRUCTION. The subsequent establishment of a shingle mill, served by a spur track, relieved a lumber company from its obligation to pay annual maintenance charges and costs, under a contract for spur track connections which provided that such charges and costs should cease if at any time such spur should be used for the benefit of industries established thereon or on any extension thereof, where the shingle mill, although 200 feet from the spur and making its own deliveries to cars on the spur, had no other way of receiving or sending shipments; it not being the intent of the contract that the new industry must have an immediate physical connection with, or platform on, the spur track.

RAILROADS (13)—CONTRACTS (71)—CONSTRUCTION BY PARTIES—CONDUCT OF PARTIES. In such case, the fact that the mill company annually made repayments of a small tax without objection, was not a practical construction of the contract, estopping it from claiming relief from the maintenance provisions after receiving a large bill therefor and considering legal advice as to the proper construction of the contract.

MACKINTOSH, J., dissents.

Appeal from a judgment of the superior court for Lewis county, Reynolds, J., entered July 21, 1924, upon findings in favor of the plaintiff, in an action on contract, tried to the court. Affirmed.

*F. M. Dudley, Geo. W. Korte, A. J. Laughon,* and *G. L. Thacker,* for appellant.

*Theodore B. Bruener* and *Dysart & Ellsbury,* for respondent.

MITCHELL, J.—The Chicago, Milwaukee & St. Paul Railway Company operates a railway line between Tacoma and Aberdeen, Washington, which crosses the

[1]Reported in 235 Pac. 794.

north half of the northeast quarter of section 12, township 15 north, range 4 west, in Thurston county. The N. & M. Lumber Company, proposing to establish a sawmill plant in the southeast quarter of the northeast quarter of the section, desired the construction and maintenance of a spur track to serve the mill plant. A written contract for that purpose was entered into between the railway company and the lumber company on October 20, 1913. The provisions of the contract material to the issue here presented are, in effect, as follows: That the lumber company should construct, maintain, and operate a sawmill at or about the point mentioned, with a cutting capacity of 60,000 feet per day, the mill to be completed by November 1, 1913. That a spur track should be built from the railway company's track southeasterly to the sawmill, with a siding or interchange track connecting at each end with the spur track. It was provided that the lumber company should procure and convey to the railway company the right of way for the spur and siding tracks, do the clearing and grading and furnish the bridge material and ties. The railway company was to lay the ties, construct the bridges and complete the spur and siding tracks, furnish all the rails, switches and fastenings. Section 7 of the contract is as follows:

"The supervision and maintenance of said spur track shall be under the direction and control of the Railway Company, but all costs of said maintenance, including taxes and assessments, shall be repaid by the Lumber Company to the Railway Company, such payments to be made at the office of the Railway Company in Chicago, Illinois, within thirty (30) days after the rendering of proper bills therefor; Provided, however, that if at any time such spur track shall be used for the benefit of industries established thereon, or on any extension thereof, and not owned or operated by the Lumber Company, the obligations of the Lumber Company to repay such costs and maintenance as above

provided shall cease; and from and after such time the cost of maintenance of such track shall be paid and borne by the Railway Company.''

The contract, by its terms, contemplated that the lumber company would construct a logging railroad from the southerly terminus of the spur, and provided for the leasing of rails and fastenings for not to exceed one and one-half miles of such logging railroad by the railway company to the lumber company. It was agreed that loaded cars to be delivered by the lumber company for outshipment and empty cars to the lumber company for loading should be delivered by each of the parties on the siding track.

Paragraph 15 of the contract is as follows:

''It is understood by and between the parties hereto that nothing herein contained shall be deemed or construed to prevent the Railway Company from extending said spur track either to reach industries owned or operated by parties other than the Lumber Company, or for any other reason whatsoever.''

The sawmill was constructed as provided in the contract, and so were the spur and siding tracks. Transportation business commenced and continued. The lumber company built its logging railroad, which extended a number of miles from its plant. In 1914, month not stated, a company in which the lumber company was in no way interested, established and has since operated a mill for the manufacture of shingles at a point a few hundred feet south of the southerly terminus of the spur track and alongside the lumber company's logging railroad. Traffic from the shingle mill is moved over a service track of its own a distance of something more than 100 feet, thence onto the lumber company's logging railroad, and thence 107 feet onto the spur built and maintained by the railway company. Traffic to the shingle mill is handled over the

same way.  This service for the shingle company is performed by the lumber company with its logging railroad locomotive and crew, for which it receives pay from the shingle company.  The lumber company and the shingle company, each independently, orders empty cars from, and bills out loaded cars to, the railway company.  In 1916, by a written contract between the parties, the Oregon-Washington Railroad & Navigation Company became jointly interested with the Chicago, Milwaukee & St. Paul Railway Company in the use of the spur and side tracks and in the business to be had and the service rendered under the contract of October 20, 1913, since which time it has had a part of the business and incurred a part of the outlay in the maintenance of the spur track, which, however, by way of assignment of its rights pertaining to this cause of action, leaves the suit to be determined as one between the plaintiff and the Chicago, Milwaukee & St. Paul Railway Company.

In the years 1915-20, the railway company annually paid taxes on the spur and siding tracks, which each year were repaid to it by the lumber company, as was the sum of $6.01 expended by the railway company in 1916 for maintenance.  Later, maintenance charges necessarily expended on the spur and siding tracks amounting to several thousand dollars were presented to the lumber company and payment thereof refused.  The lumber company refused to repay the railway company amounts it had paid out on taxes for the years 1921-3.  The railway company became indebted to the lumber company for lumber sold and delivered to it within three years just prior to May, 1923, the date of the commencement of this action, for which it refused to pay.  There were some other money demands between the parties which need not be set out, as they appear immaterial to the consideration of the case on ap-

peal. Upon the trial of the case without a jury, the findings and judgment were in favor of the lumber company. The railway company has appealed.

The appellant, in its brief, quotes the proviso in § 7 of the contract, viz.:

"Provided, however, that if at any time such spur track shall be used for the benefit of industries established thereon, or on any extension thereof, and not owned or operated by the Lumber Company, the obligations of the Lumber Company to repay such costs and maintenance as above provided shall cease; and from and after such time the cost of maintenance of such track shall be paid and borne by the Railway Company."

Appellant then says:

"The question to be determined is, therefore, whether the shingle company's mill, established at the location and in the manner hereinbefore described, is an industry established on the spur track or on an extension thereof, within the meaning of this provision. If it is, the judgment entered is right and should be affirmed; if it is not, the judgment is erroneous and should be set aside."

We may accept appellant's argument that the words "established thereon, or any extension thereof" limit and restrict the industries to those in a certain territory; and that it is only when the trackage is used for the benefit of industries established within that restricted territory that, according to the agreement of the parties, the lumber company was to be released from its maintenance obligations. But we cannot appreciate or approve the practical application made by appellant of that argument to the present situation when it says that "industries would not be established thereon unless established in such proximity thereto as to enable consignments to the industry to be delivered to the industry from the spur, or outshipments to

be loaded from the industry upon cars on the spur.''
That is, as we understand, the industry must be im-
mediately on or next to the spur track. That construc-
tion is too narrow where room is plentiful. The re-
spondent's sawmill plant is not constructed in any such
nearness to the spur track, and that plant was the
primary and a sufficient cause for the building of the
spur.

In a fair and reasonable construction of the terms
employed, what possible difference can it make whether
the industry is immediately upon the spur or, being
situate some two hundred feet away, transports goods
at its own expense to and from its plant by trucks
moved by hand, or horse, or otherwise, to a platform
on the spur used in loading and unloading a railroad
car, or, at its own expense, move the car on rails pri-
vately owned, or used between the spur and the plant?
Manifestly, what the parties had in mind that would
fulfill the condition which they agreed should, when
complied with, terminate the obligation of the lumber
company to repay the taxes and costs of maintenance
was another industry, not owned or controlled by the
lumber company, on this spur which would give the
railway additional business. The matter of an immedi-
ate physical connection between the new industry and
the spur, or that it should be so situated with reference
to the spur that a car could be loaded or unloaded im-
mediately thereat, was unimportant. The railway com-
pany has gotten all the business of the shingle com-
pany, of considerable amount, each year without the
building of any additional trackage. It has picked it
up or delivered it on this spur or interchange track,
and the new industry has no other way for receiving or
sending shipments.

Nor does § 15 of the contract, called to our attention
by the appellant, reasonably suggest anything in op-

position to our views and conclusion. Obviously, that section was intended to expressly provide against any complaint of the lumber company should the railway company decide to extend the spur track either to reach industries owned or operated by parties other than the lumber company in that or some other locality, or for any other reason whatever. There is in this case no proposal or plan on the part of the railway company to extend the spur, for which reason that section has no application here.

It is further contended on behalf of the railway company that the annual repayment to it by the lumber company of taxes paid in the years 1915-20 and of $6.01 maintenance expenses, amounting altogether to $550.28, evidences an interpretation or practical construction of the contract by both parties to the effect that the building and operation of the shingle mill did not fulfill the condition upon which the lumber company should be released from its obligation to repay taxes and maintenance charges that should be enforced or followed by the courts. The question of the practical construction of a contract by the conduct of a party to it is a matter of knowledge and of intention that such acts are referable to the contract, and manifestly not every act of one of the parties indicative of an understanding of a contract, in accordance with the claim of the other party, will be given the effect of a practical construction. The effect of particular acts must be determined from the circumstances surrounding the particular case. 13 C. J. (Contracts). p. 549.

The primary purpose of the lumber company was to get transportation service for the output of its mill. That being had, it became active and busy in its sawmill and lumber business. Its officers testified that it paid scant attention to the small items of repaying annually something more than $100 taxes, and, notwith-

standing objections which we think were properly over-ruled, they further testified that the lumber company's copy of the contract was not examined in this respect until later upon receiving a bill from the railway company amounting to something over $2,000 for repairs and maintenance charges, at which time, upon examining and considering the contract, the lumber company reached the conclusion that the establishment of the shingle mill fulfilled that condition of the contract which entitled it to be released from further obligations to repay taxes and maintenance charges, whereupon they refused to make further payments of that kind. The trial court was convinced by this evidence and held that the payments made were made without present knowledge of the terms of the contract in that respect, that is, by mistake and inadvertence, but denied the lumber company relief on one of its causes of action to recover back the amount of those payments because they were barred by the statute of limitations.

Appellant cites the case of *Chicago G. W. R. Co. v. Northern Pac. R. Co.*, 101 Fed. 792. That was a case in which three railroads entered into a contract for the joint use of a certain line of railroad, each to pay a designated portion of the expense of "keeping the line in good order, condition and repair together with insurance." The expenses were to be paid by one of the railroads which had charge of attending to the upkeep and insurance and which was to be proportionately reimbursed therefor by the other railroads. Payments were to be made monthly and were so made for ten years, when, upon a change in the management of one of the roads, it refused to pay its share of the salaries of flagmen, station agents, operators, switch lamp tenders, tower men, and similar employees necessarily and properly engaged in the operation of the line, on

the ground that such expenses were not within the terms of the contract. The circuit court of appeals, after stating that they were within the contract by implication, especially under the long continued construction placed upon the contract by the parties themselves, said:

"From the very inception of the contract, and continuing for a period of 10 years, the Northern Pacific Company claimed, and the defendant company paid, a share of these operating expenses on monthly bills, which set forth clearly and distinctly each item of expense here sued for. During that long period there was no suggestion from any quarter that the defendant company, or its predecessor in interest, was not obligated to pay the same proportion of these operating expenses as those incurred in maintaining, repairing, and insuring the property. Its obligation to do so was admitted every month in the year for 10 years by the payment, without protest or question, and with full knowledge of all the facts, of the monthly bill for its share of these expenses."

The circumstances in that case were so very different from the facts and circumstances in the present case that we cannot consider it as helpful in disposing of this one. In that case, from the very commencement of operations under the contract, statements were rendered showing by items the particular charges and expenses claimed by the company presenting the bills as being within the terms of the contract, and with that specific information, the railroad to which the claims were presented paid them monthly for a period of ten years, knowing precisely what they were for. They were positive assertions that could not be mistaken of rights under the contract that were, by the payments of the bills, acquiesced in and consented to by the other party. In the present case, no such specific or express claim was contained in the bills presented for repayment of taxes and maintenance

charges with reference to its bearing upon a condition of the contract between these parties which, at the time it was entered into, might or might not ever happen, and that was entirely out of the mind of the lumber company for some time after it did happen.

Upon consideration of the whole case, we are of the opinion that the judgment appealed from is correct. Affirmed.

TOLMAN, C. J., HOLCOMB, and BRIDGES, JJ., concur.

MACKINTOSH, J. (dissenting)—I cannot concur.